# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

|  |  |  |
|---|---|---|
| HOWARD M. STEIN, CATHY S. STEIN AND JEREMY TARK, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. N21C-09-060 CEB |
| WIND ENERGY HOLDINGS, INC., f/k/a UNITED WIND, INC., and RUSSELL TENCER, | ) ) ) ) | |
| Defendants. | ) ) | |

## MEMORANDUM OPINION

Submitted: September 27, 2022
Decided: December 13, 2022

*Upon Consideration of Defendant Russell Tencer's Motion to Dismiss*
**GRANTED**


Jeffrey S. Cianciulli, Esquire, WEIR GREENBLATT PIERCE LLP, Wilmington, Delaware. *Attorneys for Plaintiffs Howard M. Stein, Cathy S. Stein, and Jeremy Tark.*

John A. Sensing, Esquire, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; Jonathan L. Scher, Esquire, THE SCHER LAW FIRM, LLP, Carle Place, New York. *Attorneys for Defendant Russell Tencer.*


**BUTLER, R.J.**

Plaintiffs Howard M. Stein, Cathy S. Stein, and Jeremy Tark (collectively, the "Plaintiffs") are former noteholders of Wind Energy Holdings, Inc. (the "Company"), formerly known as United Wind, Inc. They allege the Company's President and CEO, Defendant Russell Tencer, fraudulently induced them to purchase debt from the Company that it never repaid. They also allege Tencer was unjustly enriched by a transactional payment that the Plaintiffs believe should have been remitted to them.

Tencer has moved to dismiss the Amended Complaint. He argues that (1) the Plaintiffs' fraud claim is time-barred and otherwise fails under Rule 9(b); and (2) the unjust enrichment claim fails to state essential elements. The Court agrees. Accordingly, the Company's motion is **GRANTED.**

## BACKGROUND

### A. The Parties

The Plaintiffs are individual investors from New York. The Company is a Delaware Corporation which operated in the green energy space—specifically wind power and environmental research and development. Its primary income derived from lease arrangements through which homeowners would pay the Company for electricity generated by wind turbines that the Company installed on their properties. Tencer is the Company's President and CEO.

## B. The Agreements

In April 2017, the Plaintiffs collectively invested $175,000 in the Company's convertible debt securities (the "Notes").[1] The Notes were memorialized in two agreements—a Promissory Note Agreement[2] and a Subscription Agreement[3] (collectively, the "Agreements")—which will be construed as one contract because they were executed as part of the same transaction.[4] Tencer is not a party to the Agreements.

### 1. Repayment Terms

The Notes were set to mature on December 31, 2019.[5] Their repayment terms,

---

[1] Pls.' Am. Compl., D.I. 22 ¶¶ 9–10 [hereinafter "Am. Compl."].

[2] The Plaintiff's signed identical versions of the agreement. Ex. A to *id.* [hereinafter "PNA"].

[3] The Plaintiff's signed identical versions of the agreement. Ex. B to *id.* [hereinafter "SA"].

[4] *E.g.*, Restatement (Second) of Contracts § 202(2) (Am. L. Inst. 1981); *accord Fla. Chem. Co., LLC v. Flotek Indus., Inc.*, 262 A.3d 1066, 1081 (Del. Ch. 2021); *see* Preamble to PNA (incorporating the SA by reference).

[5] Preamble to PNA. Although preamble or recital language is generally "not a necessary part of a contract," *New Castle Cnty. v. Crescenzo*, 1995 WL 21130, at *3 (Del. Ch. Feb. 11, 1985), courts do consider preamble or recital language necessary where, as here, the language defines terms used in the contract, *see Intermec IP Corp. v. TransCore, LP*, 2021 WL 3620435, at *13, n.134 (Del. Super. Ct. Aug. 16, 2021), and "offer[s] insight into the intent of the parties[,]" *Urdan v. WR Cap. Partners, LLC*, 2019 WL 3891720, at *15 (Del. Ch. Aug. 19, 2019), *aff'd*, 243 A.3d 668 (Del. 2020). *E.g.*, *Citadel Hldg. Corp. v. Roven*, 603 A.2d 818, 823 (Del. 1992) (explaining that preamble or recital language is an "obvious source for gaining contractual intent[,]" since "it is there that the parties expressed their purposes for executing" the contract); *cf. Llamas v. Titus*, 2019 WL 2505374, at *16 (Del. Ch. June 18, 2019) (rejecting interpretation of preamble language because language was inconsistent with contract's substantive provisions).

however, were subject to conversion to equity through "Qualified Financings"[6] and "Changes of Control."[7] Separately, the Notes could be modified by the Company's "Required Holders."[8] These Required Holders are noteholders whose credit comprises a majority of the Company's outstanding debt.[9] The Plaintiffs were not Required Holders.

### a. Qualified Financing; Change of Control

The Notes' principal and interest automatically convert to an equivalent value of equity securities if the Company executes a "Qualified Financing."[10] Qualified Financings are stock sales through which the Company sells $5,000,000 in equity to a third party.[11] Similarly, a "Change of Control" occurs when the Company sells all or substantially all of its assets to a third party.[12] Changes of Control that occur pre-conversion to equity entitle noteholders to full repayment at a 1.3x multiplier.[13] Changes of Control that occur post-conversion to equity entitle noteholders to a number of shares equivalent to the accrued principal and interest on the Notes.[14]

---

[6] Preamble to PNA; PNA § 1.
[7] PNA § 2.
[8] SA § 7.2.
[9] Recitals to *id*.
[10] PNA § 1(a); Recitals to SA.
[11] PNA § 1(a).
[12] *Id.* § 2; Recitals to SA.
[13] PNA § 2.
[14] *Id.* § 3.

## b. Modification

Under the Agreements, the Company could modify the Notes.[15]  Doing so required approval of the Company's Required Holders.[16]  Required Holders were "those Holders who hold, collectively, at least a majority in principal amount of all Notes outstanding."[17]  Modifications approved by Required Holders were effective against all the Notes (*e.g.*, the Plaintiffs' notes).[18]  Modifications could occur any time post-closing.  In other words, modifications did not depend on a Qualified Financing or Change of Control.

## 2. Risk Representations

The Notes were "speculative."[19]  They involved a "high degree of risk[.]"[20]  They did not have a market and the Company did not even "expect[] [one] to develop."[21]  It is no wonder there was an "economic risk of a total loss[.]"[22]

The Plaintiffs understood all this.  They confirmed that they read the Company's financial disclosures, which were contained in a "Risk Factors"

---

[15] SA § 7.2.
[16] *Id.* § 7.2.
[17] PNA § 6(b).
[18] SA § 7.2; PNA § 6(c).
[19] Recitals to SA.
[20] *Id.*
[21] *Id.*
[22] *Id.; see id.* § 4.1(b) (same).

5

document.[23]  There, the Company advised that it "may never achieve profitability" and could not give any "assurance" of success.[24]  It also warned that its "significant losses . . . may force[] [it] to curtail or cease operations."[25]

### 3. Reliance Representations

The Agreements purport to cabin sell-side representations.  Prospective investors were told that they may rely only on the Company's representations:

> NO PERSON HAS BEEN AUTHORIZED BY [THE COMPANY] TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATIONS OF ANY KIND WHATSOEVER CONCERNING [THE COMPANY] OR THIS OFFERING OTHER THAN THE REPRESENTATIONS CONTAINED OR REFERRED TO HEREIN, AND, IF GIVEN OR MADE, SUCH OTHER REPRESENTATIONS OR INFORMATION MUST NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY [THE COMPANY].[26]

The Company made "no representations or warranties, express or implied," other than those made in the Agreements.[27]  It also specified what it was *not* representing.  For example, the Company made no "representation or warranty

---

[23] *Id.* § 2.6; *see generally* Ex. C to Def.'s Mot. to Dismiss, D.I. 24 [hereinafter "Risk Factors"].  Although the Risk Factors are not expressly referenced in the complaint, they are incorporated into the Agreements.  So the Court may consider them.  *See infra* Standard of Review.

[24] Risk Factors.

[25] *Id.; see also* SA § 4.1(b) (investor representations regarding access to all information).

[26] Recitals to SA.

[27] SA § 3.8.

6

concerning the value of the Note[s] or the Company."[28]  Despite all this, by signing the Subscription Agreement the Plaintiffs represented that they had "access to all the information" they would need to make an educated investment decision.[29]

## C.  The Merger

The Company began to fail almost immediately.  So it restructured itself.  In September 2018, the Company entered a term sheet with a third-party buyer, Eocycle Technologies, Inc, that contemplated an asset sale and triangular merger (the "Merger").  The Merger proceeded in three steps.  First, Eocycle would securitize all the Company's operating assets.  Second, the Company would sell those assets to an acquisition entity, "NewCo."  Finally, NewCo would merge with Eocycle, thereby forming a new entity, "18, Inc."[30]  Once consummated, the Plaintiffs allege that the Merger would grant a preference payment of 20% of the revenues generated by the Company, less operating expenses, to Tencer.[31]

Following the Merger, the Notes became subordinate to debts owed to Eocycle, Tencer, and the Required Holders.  The Merger, additionally, precipitated a Change of Control.[32]  A mentioned above, Changes of Control that occur pre-

---

[28] *Id.* § 4.2.

[29] *Id.* § 4.1(b); s*ee also id.* § 7.2 (integration clause).

[30] Am. Compl. ¶¶ 14–15, 22–31.

[31] *Id.* ¶ 19.

[32] The Merger does not appear to be a Qualified Financing because the Company did not receive cash from a stock sale, but rather from selling its assets to NewCo.

conversion require immediate repayment on the Notes with a 1.3x multiplier. To avoid acceleration of the repayment provision, the Company sought to modify the Notes before the Merger.

## D. The Waiver Agreement

In September 2018, the Company proposed to its Required Holders a modification of the Notes' original terms (the "Waiver Agreement").[33] The modification would (i) extend the Notes' maturity date to August 29, 2028; (ii) give the Required Holders a repayment preference over non-Required Holders; and (iii) waive any pre-existing right to repayment that could follow from the Merger.[34] The Required Holders approved these terms. Then the Merger closed in April 2019.

## E. The Fraud Allegations

The Plaintiffs objected to the Merger and the Waiver Agreement.[35] This is understandable. The Merger and Waiver Agreement deferred the Notes' maturity by a decade, subordinated the Notes to Eocycle, Tencer, and the Required Holders, and cancelled their right to immediate repayment. As observed, however, the

---

[33] Ex. F to Def.'s Mot. to Dismiss, D.I. 24 at .pdf p. 126–40 [hereinafter the "Waiver Agreement"]. The complaint references the Waiver Agreement without attaching it. *See* Am. Compl. ¶¶ 18, 23.
[34] Waiver Agreement §§ 1–2; Recitals to *id.* § G.
[35] Am. Compl. ¶ 63.

Plaintiffs' views on all this did not matter—they were not Required Holders. And modifications approved by the Required Holders are effective against all the Notes.[36]

Although the Company purportedly survived in some form, the Plaintiffs never saw returns on their investments. They allege that this is due to fraud.

The Plaintiffs allege that Tencer and the Company's "agents" misrepresented and omitted "relevant" information about the Company's financial status at the time the Plaintiffs invested in the Notes.[37] The Plaintiffs claim the following as misrepresentations and omissions:

1. The Company was "viable" and set to close a "very large" institutional investment, "which never materialized."[38]

2. The Company "did not have sufficient funds to continue operations and to pay one month of payroll."[39]

3. The Company was shopping the Merger when the Plaintiffs purchased the Notes, but did not disclose the Merger at the time.[40]

4. Tencer would receive a 20% preference from the (undisclosed) Merger.[41]

The Plaintiffs also claim a number of unspecified misrepresentations or omissions related to the Company's prospects for financial success.[42]

---

[36] SA § 7.2; PNA § 6(c).
[37] Am. Compl. ¶ 51.
[38] *Id.* ¶ 45.
[39] *Id.* ¶ 50(a). This allegation is restated in the next subsection using different words. *Id.* ¶ 50(b).
[40] *Id.* ¶ 50(c).
[41] *Id.* ¶¶ 54–55.
[42] *See, e.g., id.* ¶¶ 46–47.

## F. The Procedural History

### 1. The New York Action

The Plaintiffs initially sued the Company and Tencer in New York (the "New York Action").[43] They alleged, among other things, contractual fraud and unjust enrichment. The Company and Tencer moved to dismiss, citing the Delaware forum selection clauses in the Agreements. On February 8, 2021, the New York court granted the motion and dismissed the complaint.

### 2. This Litigation

#### a. The Original Complaint

On September 9, 2021, the Plaintiffs filed their complaint in this Court. The original complaint brought three claims: (i) breach of contract against the Company; (ii) contractual fraud against the Company and Tencer; and (iii) unjust enrichment against Tencer.[44] The original complaint did not allege any of the specific misrepresentations or omissions identified above.[45]

On November 10, 2021, the Plaintiffs moved to enter a default judgment against the Company.[46] On December 15, 2021, that motion was granted.[47]

---

[43] *See* Ex. A to Pl.'s Answering Br., D.I. 27 (N.Y. Ct. Order).
[44] Original Compl., D.I. 1 ¶¶ 33–58.
[45] *Compare id.* ¶¶ 43–52, *with* Am. Compl. ¶¶ 43–58.
[46] Pl.'s Mot. for Default J., D.I. 4.
[47] Order Granting Default J., D.I. 11.

10

Plaintiffs were awarded $145,184.34 in breach of contract damages.[48] The Company never moved to vacate the default.

On January 21, 2022, Tencer moved to dismiss the complaint. On February 7, 2022, the Plaintiffs opposed the motion. On March 18, 2022, Tencer replied. At that point, the motion should have been deemed submitted for decision based on the original complaint. But the Plaintiffs had a different idea.

### b. The Amended Complaint

On April 6, 2022, the Plaintiffs unilaterally amended their complaint. The amendments arrived more than 20 days after the original complaint and without a prior request for leave to amend from the Court. So the amended complaint was invalid under Rule 15.[49] Nevertheless, Tencer did not challenge the amendments. Instead, he stipulated to them.[50] Then he renewed his motion to dismiss.[51] Because the Court granted the stipulation to amend,[52] this Opinion disregards the Rule 15 problem and treats the amended complaint as operative.

The Amended Complaint makes two claims against Tencer. The first—Count III—is a contractual fraud claim based on the allegations recited above. The second—Count IV—is an unjust enrichment claim alleging Tencer improperly

---

[48] *Id.*
[49] Del. Super. Ct. Civ. R. 15(a).
[50] Def.'s Stipulation to Am. Compl., D.I. 23.
[51] Def.'s Mot. to Dismiss Am. Compl., D.I. 24.
[52] Order Granting Stipulation, D.I. 26.

11

received a 20% preference payment from the Merger that should have been remitted to the Plaintiffs.

## STANDARD OF REVIEW

A party may move to dismiss under Rule 12(b)(6) for failure to state a claim on which relief can be granted.[53] In considering a Rule 12(b)(6) motion, the Court (1) accepts as true all well-pleaded factual allegations in the complaint; (2) credits vague allegations if they give the opposing party notice of the claim; and (3) draws all reasonable factual inferences in favor of the non-movant.[54] Dismissal is inappropriate unless "under no reasonable interpretation of the facts alleged could the complaint state a claim for which relief might be granted."[55]

Delaware's motion to dismiss standard is "minimal."[56] It asks "whether there is a possibility of recovery."[57] The Court, however, need not "accept conclusory allegations unsupported by specific facts or . . . draw unreasonable inferences in

---

[53] Del. Super. Ct. Civ. R. 12(b)(6).

[54] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Holdings LLC*, 27 A.3d 531, 535 (Del. 2011).

[55] *Unbound Partners Ltd. P'ship v. Invoy Holdings Inc.*, 251 A.3d 1016, 1023 (Del. Super. Ct. 2021) (internal quotation marks omitted).

[56] *Cent. Mortg.*, 27 A.3d at 536.

[57] *Garfield v. BlackRock Mortg. Ventures, LLC*, 2019 WL 7168004, at *7 (Del. Ch. Dec. 20, 2019) (citing *id.* at 537, n.13 ("Our governing 'conceivability' standard is more akin to 'possibility,' while the federal 'plausibility' standard falls somewhere beyond mere 'possibility' but short of 'probability.'")).

favor of the non-moving party."[58]  The Court may reject "every strained interpretation of the allegations proposed by the plaintiff."[59]

"The complaint generally defines the universe of facts that the trial court may consider in ruling on a Rule 12(b)(6) motion . . . ."[60] The Court may consider matters outside the complaint only if "the document is integral to a plaintiff's claim and incorporated into the complaint[.]"[61] Where a plaintiff "chooses to refer to a document in its complaint, the Court may consider the entire document, even those portions not specifically referenced in the complaint."[62] "[A] claim may be dismissed if allegations in the complaint or in the exhibits incorporated into the complaint effectively negate the claim as a matter of law."[63]

---

[58] *Price v. E.I. DuPont de Nemours & Co.*, 26 A.3d 162, 166 (Del. 2011), *overruled on other grounds by Ramsey v. Ga. S. Univ. Advanced Dev. Ctr.*, 189 A.3d 1255, 1277 (Del. 2018).

[59] *Malpiede v. Townson*, 780 A.2d 1075, 1083 (Del. 2001).

[60] *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 168 (Del. 2006).

[61] *Windsor I, LLC v. CWCap. Asset Mgmt. LLC*, 238 A.3d 863, 873 (Del. 2020) (internal quotation marks omitted). *See In re Gardner Denver, Inc.*, 2014 WL 715705, at *4 (Del. Ch. Feb. 21, 2014) ("Whether a document is integral to a claim and incorporated into a complaint is largely a fact-and-circumstances inquiry . . . . [T]he Court may conclude a document is integral to the claim if it is the source for the facts as pled in the complaint." (cleaned up)).

[62] *Okla. Firefighters Pension & Ret. Sys. v. Corbat*, 2017 WL 6452240, at *13, n.233 (Del. Ch. Dec. 18, 2017) (internal quotation marks omitted).

[63] *Malpiede*, 780 A.2d at 1083.

## ANALYSIS

### A. The Defendant is entitled to dismissal of Count III.

#### 1. The Court's analysis relies on long-standing principles of contract interpretation.

The principles of contract interpretation are well-established and grounded on the parties' objective intent at the time of contracting as expressed by the plain language contained within their agreement's four corners.[64] The Court construes a contract as a whole, giving purpose to each provision.[65] And the Court accords a contract's "clear and unambiguous terms . . . their ordinary meaning."[66] "A court must accept and apply the plain meaning of an unambiguous term . . . insofar as the parties would have agreed *ex ante*."[67] "If a writing is plain and clear on its face, *i.e.*, its language conveys an unmistakable meaning, the writing itself is the sole source for gaining an understanding of intent."[68]

The prevailing contract interpretation must be reasonable.[69] A contract interpretation is reasonable when the contract language is "read in full and situated

---

[64] *E.g.*, *Fletcher v. Feutz*, 246 A.3d 540, 555 (Del. 2021).

[65] *E.g.*, *Elliott Assocs., L.P. v. Avatex Corp.*, 715 A.2d 843, 854 (Del. 1998).

[66] *Leaf Invenergy Co. v. Invenergy Renewables LLC*, 210 A.3d 688, 696 (Del. 2019) (internal quotation marks omitted).

[67] *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 740 (Del. 2006).

[68] *City Investing Co. Liquidating Tr. v. Cont'l Cas. Co.*, 624 A.2d 1191, 1198 (Del. 1993).

[69] *See, e.g.*, *Salamone v. Gorman*, 106 A.3d 354, 368 (Del. 2014) ("Contract terms themselves will be controlling when they establish the parties' common meaning so

14

in the commercial context between the parties."[70] Even so, "background facts cannot be used to alter the language chosen by the parties within the four corners of their agreement."[71] "[I]t is not the job of a court to relieve . . . parties of the burdens of contracts they wish they had drafted differently but in fact did not."[72]

### 2. Plaintiffs' claims of fraud do not satisfy Rule 9(b).

To state a fraudulent inducement claim, the Plaintiffs must allege "(i) a false representation made by the defendant; (ii) the defendant knew or believed the representation was false or was recklessly indifferent to its truth; (iii) the defendant intended to induce the plaintiff to act or refrain from acting; (iv) the plaintiff acted or refrained from acting in justifiable reliance on the representation; and (v) damage resulted from such reliance."[73]

Fraud claims must satisfy Rule 9(b).[74] Rule 9(b) requires that "the circumstances constituting fraud" be pleaded with heightened particularity.[75] "The

---

that a reasonable person in the position of either party would have no expectations inconsistent with the contract language." (internal quotation marks omitted)).

[70] *Chi. Bridge & Iron Co. N.V. v. Westinghouse Elec. Co. LLC*, 166 A.3d 912, 926–27 (Del. 2017); *accord OptiNose AS v. Currax Pharms., LLC*, 264 A.3d 629, 638 (Del. 2021).

[71] *Town of Cheswold v. Cent. Del. Bus. Park*, 188 A.3d 810, 820 (Del. 2018).

[72] *DeLucca v. KKAT Mgmt., L.L.C.*, 2006 WL 224058, at *2 (Del. Ch. Jan. 23, 2006).

[73] *Valley Joist BD Holdings, LLC v. EBSCO Indus., Inc.*, 269 A.3d 984, 988 (Del. 2021).

[74] Del. Super. Ct. Civ. R. 9(b).

[75] *Avve, Inc. v. Upstack Techs., Inc.*, 2019 WL 1643752, at *5 (Del. Super. Ct. Apr. 12, 2019) (internal quotation marks omitted).

factual circumstances that must be stated with particularity refer to the time, place, and contents of the false representations; the facts misrepresented; the identity of the person(s) making the misrepresentation; and what that person(s) gained from making the misrepresentation."[76]

In contrast, knowledge may be averred generally. Allegations "that give rise to an inference of knowledge on the part of the pleader need not be pleaded with particularity."[77] Given this liberal standard, pleading knowledge in the contractual fraud context "is relatively easy."[78] It is not, however, lockstep. When a fraud claim, "at its core," charges a defendant with knowing something, "there must, at least, be sufficient well-pleaded facts from which it can be reasonably inferred that this 'something' was knowable and that the defendant was in a position to know it."[79] A sell-side officer cannot be liable for knowledge of fraud unless the plaintiff pleads that he "acted with an illicit state of mind, [*i.e.*,] that the [he] knew that the

---

[76] *Valley Joist*, 269 A.3d at 988.

[77] *Kahn Bros. & Co., Inc. Profit Sharing Plan & Tr. v. Fischbach Corp.*, 1989 WL 109406, at *5 (Del. Ch. Sept. 19, 1989); *see Desert Equities, Inc. v. Morgan Stanley Leveraged Equity Fund II, L.P.*, 624 A.2d 1199, 1208 (Del. 1993) ("Intent and state of mind . . . may be averred generally because any attempt to require specificity in pleading a condition of mind would be unworkable and undesirable." (internal quotation marks omitted)).

[78] *Prairie Cap.*, 132 A.3d at 62.

[79] *Metro Commc'n Corp. BVI v. Advanced Mobilecomm Techs. Inc.*, 854 A.2d 121, 147 (Del. Ch. 2004) (internal quotation marks omitted).

[company's] representation was false and either [(i)] communicated it to the buyer directly itself or [(ii)] knew that the company had."[80]

A party "cannot pursue a fraud claim merely because business plans did not pan out."[81] Delaware courts will dismiss fraud claims that allege, without more, (i) expectations for future financial success;[82] or (ii) reversals that occur post-closing (*i.e.*, "fraud by hindsight").[83] Nor can a party "bootstrap a breach of contract claim into a fraud claim merely by adding the words fraudulently induced or alleging that the contracting parties never intended to perform."[84] Accordingly, a plaintiff cannot "couch[] an alleged failure to comply with a contract as a failure to disclose an intention to take certain actions arguably inconsistent with that contract[.]"[85]

Count III alleges fraud based on events arising from the negotiation process for the Notes. The complaint says that Tencer and "agents" made misrepresentations

---

[80] *ABRY Partners V, LP v. F & W Acquisition LLC*, 891 A.2d 1032, 1064 (Del. Ch. 2006).

[81] *Mooney v. E.I. du Pont de Nemours & Co.*, 2017 WL 5713308, at *6 (Del. Super. Ct. Nov. 28, 2017), *aff'd*, 2018 WL 3861371 (Del. Aug. 13, 2018).

[82] *E.g.*, *Trenwick Am. Litig. Tr. v. Ernst & Young, L.L.P.*, 906 A.2d 168, 209–10 (Del. Ch. 2006).

[83] *E.g.*, *Noerr v. Greenwood*, 1997 WL 419633, at *4–6 (Del. Ch. July 16, 1997).

[84] *Swipe Acquisition Corp. v. Krauss*, 2020 WL 5015863, at *11 (Del. Ch. Aug. 25, 2020) (internal quotation marks omitted).

[85] *Narrowstep, Inc. v. Onstream Media Corp.*, 2010 WL 5422405, at *15 (Del. Ch. Dec. 22, 2010); *cf. Smash Franchise Partners, LLC v. Kanda Hldgs., Inc.*, 2020 WL 4692287, at *17 (Del. Ch. Aug. 13, 2020).

and omitted "relevant" facts about the Company's financial outlook.[86] The Court addresses each allegation in turn.

### a. Future Financial Success

The Plaintiffs first allege Tencer, through an agent, misrepresented that the Company was "viable" and set to close a "very large" institutional investment, "which never materialized."[87] But "statements regarding management's expectations for a company's future performance[]" generally are not actionable in fraud.[88] Instead, "[f]orward-looking statements of opinion are actionable as fraudulent only if they were known to be false when made or were made with a lack of good faith."[89]

Here, the Plaintiffs offer no reasonably conceivable basis from which to infer that Tencer knew the institutional investment would not close. The Plaintiffs suggest that Tencer *should* have known the investment would never materialize "given the [alleged] dire financial condition" of the Company.[90] But they fail to explain how Tencer's outlook was fraudulent and not merely optimistic. "[A] plaintiff may not simply contrast a defendant's past optimism with less favorable actual results and

---

[86] Am. Compl. ¶¶ 44–58.
[87] *Id.* ¶ 45.
[88] *Mooney*, 2017 WL 5713308, at *6.
[89] *Id.*
[90] Am. Compl. ¶ 46.

then contend that the difference must be attributable to fraud."[91]  This allegation does just that and therefore does not support the claim.

### b.  Sufficient Funding & Operational Losses

The Plaintiffs next allege Tencer omitted facts about the Company's losses and its inability to pay its employees over the 30-day period after the Notes' closing.[92]

"[A]ny claim of fraud in an arms' length setting[,]" like the Notes' offering, "necessarily depends on some form of representation.  A fraud claim in that setting cannot start from an omission."[93]  But the Plaintiffs offer no contemporaneous representations from Tencer—or anyone else—guaranteeing the Company's near-term success.  Nor do they plead contemporaneous facts from which to infer that Tencer told the Plaintiffs to disregard disclaimers in the Agreements or Risk Factors.  Indeed, the Risk Factors, for example, disclosed that the Company already faced and would continue to face "significant losses" that "may force[] [it] to curtail or cease operations."[94]  The Plaintiffs knew and accepted that the Company may not get out of the blocks.  There was nothing to omit.

---

[91] *Noerr*, 1997 WL 419633, at *4 (internal quotation marks and alterations omitted).
[92] Am. Compl. ¶ 50(a)-(b).
[93] *Prairie Cap.*, 132 A.3d at 52.
[94] Risk Factors*; see also* Agreements §§ 2.6, 4.1(b).

Perhaps this is why the Plaintiffs use the terms "relevant" and "material" interchangeably.[95] To state a fraud claim, the omitted fact must be material, not just relevant. The Plaintiffs do not plead with particularity facts supporting a reasonable inference that knowing about specific types of losses would have "*significantly* altered the total mix of information [already] made available" to them.[96]

Given the absence of performance-based assurances, this allegation—like others—posits an impermissible fraud by hindsight theory. A party cannot plead an intent to defraud using subsequent reversals absent contemporaneous facts supporting a reasonable inference that the defendant knew the future reversal would happen.[97] Rule 9(b)'s particularized pleading requirements "exist[] in large measure so that defendants are not subjected to fraud claims simply because business plans did not work out as hoped."[98]

The Plaintiffs wanted returns. They did not receive any. That was due to the Company's risks, unclear valuation, and right to modify the Notes without the

---

[95] *Compare* Am. Compl. ¶ 50, *with id.* ¶ 51.
[96] *Zirn v. VLI Corp.*, 681 A.2d 1050, 1056 (Del. 1996) (emphasis added) (internal quotation marks omitted).
[97] *See, e.g.*, *Mooney*, 2017 WL 5713308, at *6–7 (discussing fraud by hindsight and collecting cases); *Lewis v. Austen*, 1999 WL 378125, at *4–5 (Del. Ch. June 2, 1999) (same).
[98] *Trenwick Am. Litig. Tr.*, 906 A.2d at 210–11.

Plaintiffs' consent. The Plaintiffs cannot use a fraud claim to rewrite the terms they willingly accepted.[99]

### c. The Merger

The Plaintiffs next allege that Tencer knew about the Merger in April 2017, even though it was not negotiated until September 2018 and did not close until April 2019.[100] This is another allegation of fraud by hindsight.

There are no facts from which to infer Tencer withheld (or knew about) the Merger—and the subsequent Waiver Agreement—at the time of the Plaintiffs' investment. To the extent the Plaintiffs claim their Notes were improperly converted or subordinated, that allegation sounds in breach of contract. But the Company, not Tencer, is a party to the Agreements. And the Plaintiffs cannot "bootstrap" a breach of contract claim against the Company into a fraud claim against Tencer by baldly alleging that Tencer knew the Company would not repay the Notes.[101]

---

[99] *See Urdan v. WR Cap. Partners, LLC*, 244 A.3d 668, 675 (Del. 2020) (The Court must "interpret . . . contracts as written and not as hoped for by litigation-driven arguments."); *Nemec v. Shrader*, 991 A.2d 1120, 1126 (Del. 2010) ("Parties have a right to enter into good and bad contracts, the law enforces both."); *DeLucca*, 2006 WL 224058, at *2 ("[I]t is not the job of a court to relieve . . . parties of the burdens of contracts they wish they had drafted differently but in fact did not."); *Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 872 A.2d 611, 624 (Del. Ch. 2005), ("It is not the court's role to rewrite the contract . . . [or] allocat[e] the risk of an agreement after the fact . . . ."), *rev'd in part on other grounds*, 901 A.2d 106 (Del. 2006).

[100] Am. Compl. ¶ 50(c).

[101] Although the anti-bootstrapping rule applies to fraud claims made against a contract party, it applies here by analogy. There are no particularized facts from which to infer Tencer knew the Company's Note representations were false. *Cf.*

21

### d. Preferential Payment

Finally, the Plaintiffs allege that the contract term allotting Tencer a 20% preference from the Merger was obtained through omission of material facts.[102] Just as there are no facts indicating Tencer knew about the Merger a year before it was negotiated, there are no facts from which to infer Tencer witheld (or knew about) the contract term granting preferential payment at the time of Plaintiff's investment. For that reason, it also rests on fraud by hindsight.

In sum, the Plaintiffs essentially seek to obtain remedies in fraud that they did not secure in contract. Accordingly, Tencer's motion to dismiss is granted as to Count III.

## B. The Defendant is entitled to dismissal of Count IV.

"Unjust enrichment is the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience."[103] Unjust enrichment has five elements:

---

*Transdev On Demand, Inc. v. Blackstreet Inv. Hldg., LLC*, 2020 WL 7027538, at *6 (Del. Ch. Nov. 30, 2020). So the fraud claim essentially tries to assert a breach of contract claim against Tencer as an agent of the Company. But a non-party is not liable for another's breach. *Cf. Bhole, Inc. v. Shore Invs., Inc.*, 67 A.3d 444, 453 (Del. 2013) (recognizing a tortious interference with contract claim—not a contract or fraud claim—where a non-party allegedly takes acts that cause a party to breach its contract). This case is no exception.

[102] Am. Compl. ¶¶ 54–55.

[103] *Nemec*, 991 A.2d at 1130 (internal quotation marks omitted).

(1) enrichment; (2) impoverishment; (3) a relationship between the enrichment and the impoverishment; (4) lack of justification; and (5) absence of a legal remedy.[104]

"Courts developed unjust enrichment as a theory of recovery to remedy the absence of a formal contract."[105] As a result, unjust enrichment claims may be preempted where a contract "comprehensively governs the parties' relationship[.]"[106] Where a contract is "the measure of the plaintiffs' right, there can be no recovery under an unjust enrichment theory independent of it."[107]

Unjust enrichment claims do not vary the ordinary rules prohibiting contract parties from bringing breach of contract claims against non-contract parties.[108] A contract party "cannot use a claim for unjust enrichment to extend the obligations of a contract to [persons] who are not parties to the contract."[109] "At bottom, an unjust enrichment claim cannot be used to circumvent an inadequate breach-of-contract claim."[110] "Even if the bargain they strike ends up a bad deal for one or both parties, the court's role is to enforce the agreement as written."[111]

---

[104] *Id.*

[105] *Fannin v. UMTH Land Dev., L.P.*, 2020 WL 4384230, at \*26 (Del. Ch. July 31, 2020).

[106] *BAE Sys. Info. & Elec. Sys. Integration, Inc. v. Lockheed Martin Corp.*, 2009 WL 264088, at \*7 (Del. Ch. Feb. 3, 2009).

[107] *Wood v. Coastal States Gas Corp.*, 401 A.2d 932, 942 (Del. 1979).

[108] *E.g.*, *Vichi v. Koninklijke Phillips Elecs. N.V.*, 62 A.3d 26, 58–59 (Del. Ch. 2012).

[109] *Kuroda v. SPJS Holdings, L.L.C.*, 971 A.2d 872, 892 (Del. Ch. 2009).

[110] *Intermec,* 2021 WL 3620435, at \*17.

[111] *Glaxo Grp. Ltd. v. DRIT LP*, 248 A.3d 911, 919 (Del. 2021).

These principles apply with greater force to unjust enrichment's third element—a relationship between the enrichment and the impoverishment. To state this element, the plaintiff "must show that there is some direct relationship between a defendant's enrichment and [the] plaintiff's impoverishment."[112] "It is not enough that the defendant received a benefit from the activities of the plaintiff[.]"[113] Instead, "there must be a showing that the defendant was unjustly enriched *by* the plaintiff who acted *for* the defendant's benefit."[114] Non-party relationships generally do not fit this paradigm. Accordingly, an unjust enrichment claim cannot be brought against a non-contract party unless the plaintiffs plead that the non-party "knowingly facilitate[d] and benefit[ted] from the breach of a party to the contract."[115]

### 1. The Plaintiffs fail to state the relationship element for unjust enrichment in their complaint.

The Plaintiffs were not Required Holders.[116] So their investor status was not essential to the Merger. Moreover, they *dissented* on the Merger and Waiver Agreement.[117] They did not vote for Tencer's 20% preference or agree with the

---

[112] *Coretel Am., Inc. v. Oak Point Partners, LLC*, 2022 WL 2903104, at *11 (Del. Super. Ct. July 21, 2022) (internal quotation marks and omission omitted).

[113] *MetCap Sec. LLC v. Pearl Senior Care, Inc.*, 2007 WL 1498989, at *6 (Del. Ch. May 16, 2007) (internal quotation marks omitted).

[114] *Coretel*, 2022 WL 2903104, at *11 (emphases added) (alteration and internal quotation marks omitted).

[115] *Id.*

[116] PNA § 6(b).

[117] Am. Compl. ¶ 63.

24

Required Holders. So they did not act for Tencer's benefit either. Taken together, there is no direct relationship between any enrichment and impoverishment. It is not reasonably conceivable that Tencer benefitted from anything the Plaintiffs did.

Tencer is not a party to the Agreements. The Agreements specify the circumstances under which the Notes could be modified. It therefore comprehensively regulates Notes' repayment. If the Plaintiffs' Notes were wrongly subordinated, then the Plaintiffs would have a breach of contract claim against the Company. Although they failed to assert such a claim against the Company,[118] they cannot cure that deficiency by seeking remedies from a non-party like Tencer.

In sum, the Plaintiffs try to use unjust enrichment to extend the Agreements to Tencer or to renegotiate protections they bargained away. Delaware law does not permit this. Accordingly, Count IV is dismissed.

---

[118] There is no allegation in the complaint that the Company wrongly converted their Notes or that the Required Holders did not validly consent to a modification. In fact, the opposite is true. The complaint references the Waiver Agreement, Am. Compl. ¶¶ 18, 23, which shows that the Required Holders did vote to convert the Notes, *see* Ex. F to D.I. 24 at .pdf p. 126–40. Although the Plaintiffs suggest otherwise in their brief and at oral argument, briefs and oral arguments do not amend or expand pleadings. *See Arkout v. Jarkoy*, 2018 WL 3361401, at *3 n.23 (Del. Ch. July 10, 2018) (collecting cases). And a claim may be dismissed if the allegations in the complaint or the exhibits integral to it negate the claim as a matter of law. *Malpiede*, 780 A.2d at 1083. That is the case here.

**CONCLUSION**

For the foregoing reasons, the Defendant's motion to dismiss is **GRANTED.**

**IT IS SO ORDERED**

Charles E. Butler, Resident Judge